Filed 8/12/15  In re D.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.G., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E063094 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1400047) |
| v. | O P I N I O N |
| A.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Shobita Misra, under appointment by the Court of Appeal, for Defendant and Appellant A.G.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant R.G.

1

Gregory P. Priamos, County Counsel, and James E. Brown, Guy B. Pittman, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendants and appellants, A.G. (Mother) and R.G. (Father), are the parents of a girl, D.G., born in September 2013.  The parents appeal orders terminating their parental rights and placing D.G. for adoption.  (Welf. & Inst. Code, § 366.26.)[1]  We affirm the challenged orders.

Mother, joined by Father, claims the juvenile court erroneously refused to apply the parental benefit exception to the adoption preference based on Mother's contacts with D.G.  (§ 366.26, subd. (c)(1)(B)(i).)  We conclude the court properly refused to apply the parental benefit exception and properly terminated parental rights.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Events Underlying D.G.'s Dependency*

D.G. was taken into protective custody on January 13, 2014, when she was three months old, following a domestic violence incident between the parents in her presence. The parents were married and living with D.G.  Father was 25 years old; Mother was 19 years old.  Mother attended college and relied on Father to care for D.G. while she was at school.  Father had been unemployed since November 2013 and had a five-year-old son who lived with his mother.  Mother had no other children.

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The domestic violence incident occurred on January 12, while Mother was cooking breakfast. Father "freaked out" and "lost his mind" when he saw a knife Mother was using to cut potatoes. He began throwing food from the refrigerator onto the floor, and broke the refrigerator door. Father had been using methamphetamine on a daily basis since he lost his job in November 2013. Mother had last used methamphetamine three days before the incident, on January 9, and tested positive for methamphetamine on January 13.

After Father broke the refrigerator door, Mother ran into the bedroom and Father followed her, asking where he had put his stash of methamphetamine. Mother told him it was in his jacket on the couch where D.G. was lying. When Father went to retrieve his methamphetamine, Mother attempted to leave the apartment. Father grabbed Mother's hair and arm, threw her on a bed, twisted her arm behind her back, then dragged her onto the floor. He left the bedroom and locked Mother inside, then returned to the bedroom, where he smashed Mother's laptop and broke a mirror, leaving broken glass "everywhere." Mother left the apartment and Father locked her out.

Mother contacted law enforcement to let her back inside the apartment. When the police arrived, Mother was inside the apartment with Father and denied any domestic violence had occurred, saying they had "just wrestled." Father was arrested for domestic violence, false imprisonment, child endangerment, and possession of drug paraphernalia (a glass methamphetamine pipe with residue). Mother did not want to press charges against Father.

3

Mother had an unstable childhood. She was "a chronic run away" as a child and was on probation. At the age of 16, she was sent to live in a group home facility in Utah for 11 months, "a placement for troubled youth." Apparently before that, she was twice sent to juvenile hall in Los Angeles, and violated her probation. She twice left the Los Angeles juvenile hall, without permission, and twice left the Utah facility, also without permission. Her aunt adopted her when she was five years old, and she lived with her grandmother before her aunt adopted her. She denied any abuse by her biological parents but said they probably neglected her.

Mother first used methamphetamine when she was 17 years old. She began using it "consistently" at age 18, stopped while she was pregnant with D.G.; then began using it again around December 2013, when she was 19 years old and D.G. was less than three months old. She was using methamphetamine around twice weekly, while Father was using it daily. She also took medication for attention deficit/hyperactivity disorder (ADHD), but infrequently.

When a social worker from plaintiff and respondent, Riverside County Department of Public Social Services (DPSS), visited the family apartment on January 13, 2014, it was neat and clean, and D.G. showed no signs of abuse or neglect. Mother bailed Father out of jail on January 14. Like Mother, Father was on juvenile probation at the age of 16. He had been arrested several times, most recently in November 2012 for grand theft auto, but those charges were dropped. He began using methamphetamine "in earnest" at the age of 16. He denied being around D.G. while under the influence, and

4

denied using methamphetamine with Mother. He claimed he only used methamphetamine outside the home.

B. *The Initial Dependency Proceedings*

D.G. was ordered detained outside the parents' custody on January 16, 2014. On January 28, D.G. was placed in the home of her maternal grandparents, who later became her prospective adoptive parents. The parents had supervised visits with D.G. on January 24 and February 1, 2014, and the visits "went well."

By January 31, 2014, Mother was participating in outpatient treatment and other services through a program offered by New Creation Addiction Treatment Center (New Creation). On February 7, she enrolled in an inpatient program through New Creation but left the program on February 19. Mother tested positive for methamphetamine on February 7 and 10, but tested negative on February 15, 17, and 19. Mother, Father, and a resident of the New Creation program spent the weekend of February 24 and 25 "partying" and doing drugs. On March 7, Mother enrolled in a new outpatient program.

On March 13, 2014, the juvenile court sustained allegations that the parents had ongoing domestic violence disputes in the home in the presence of D.G., and abused methamphetamine in the home while caring for D.G. D.G. was ordered removed from parental custody, and reunification services were ordered for both parents. The parents' services were terminated at the six-month review hearing in October 2014, and a section 366.26 hearing was set.

Prior to the review hearing, DPSS reported Mother had made no progress in her case plan. Between March and October 2014, she was enrolled in several substance abuse treatment programs, but left each program before completing it. She did not submit to any random drugs tests between March and October 2014. Her whereabouts were unknown between July 27 and August 18, after she left one treatment program. Her participation in other aspects of her case plan was sporadic at best. She attended only a few parenting and domestic violence classes, and did not participate in any individual counseling sessions. She tested positive for methamphetamine only two days before the October 16 review hearing.

Father did not participate in any services. In June 2014, he was arrested for being under the influence of methamphetamine. In October 2014, he was arrested and charged with felony possession of methamphetamine, misdemeanor possession of drug paraphernalia, and violation of his probation.

C. *The Section 366.26 Hearing*

In February 2015, DPSS reported Mother had significant contacts with D.G. over the previous year, though her contacts were "at times inconsistent." Except for the period in July and August 2014, when her whereabouts were unknown, Mother had once weekly, two-hour supervised visits with D.G. in the home of the maternal grandparents. The visits were "appropriate" but never progressed to unsupervised visits. The maternal grandmother assured DPSS she would not allow Mother to visit D.G. if Mother was

under the influence of controlled substances.  Father had had sporadic contacts with D.G. since January 2014, and D.G. was uncomfortable in his presence.

D.G. was a "cherished member" of the grandparents' family.  She had a strong emotional attachment to the grandparents and no developmental delays.  The grandparents were willing to adopt her, and they did not want to enter into a postadoption agreement with Mother.

At the March 3, 2015, section 366.26 hearing, the court terminated parental rights and placed D.G. for adoption, after rejecting Mother's request to select legal guardianship rather than adoption as D.G.'s permanent plan, on the ground the parental benefit exception applied based on Mother's contacts with D.G.  (§ 366.26, subd. (c)(1)(B)(i).)

### III.  DISCUSSION

Mother claims the juvenile court erroneously refused to apply the parental benefit exception to the adoption preference based on her continued visits with D.G.  Father joins this claim, and argues that if Mother's parental rights are reinstated then his parental rights should also be reinstated.  We conclude the court properly refused to apply the parental benefit exception.  Thus, we affirm the section 366.26 orders.

A.  *Applicable Legal Principles and Standard of Review*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  Permanent plans include adoption, guardianship, and long-term foster care.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.)  "Adoption, where possible, is the permanent

7

plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) Adoption requires terminating the parental rights of the child's parents. (*Id.* at p. 574.)

To avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) These exceptions permit the court "to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

The parental benefit exception applies when two conditions are shown: the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The relationship must be a *parental* one, not merely a pleasant relationship with a shared, emotional bond. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) To prove the child would benefit from continuing the parental relationship, the parent must show "either that (1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

"'The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs. [Citation.]'" (*In re*

*Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349-1350.) "If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.)

Our state appellate courts have traditionally applied both the substantial evidence test and the abuse of discretion test in considering challenges to juvenile court determinations that the parental benefit exception did not apply. (*In re Scott B.*, *supra*, 188 Cal.App.4th at p. 469.) As one court explained: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . .'" [Citations.]" (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

More recently, the state appellate courts have applied a composite standard of review, recognizing that the parental benefit exception entails both factual and discretionary determinations. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [substantial evidence standard applies to the factual determination of whether beneficial relationship exists, and abuse of discretion standard applies to the determination of whether there is a compelling reason to apply the exception]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [same].)

B. *Analysis*

Mother claims it was detrimental to D.G. not to apply the parental benefit exception and to terminate her parental rights. She argues her visits were consistent and predictable, and the "high quality" of her visits contributed to D.G.'s "sense of security, well-being, and overall development." She claims DPSS repeatedly acknowledged that D.G. was emotionally attached to her.

Substantial evidence shows, however, that Mother did not occupy a parental role in D.G.'s life. In addition, the juvenile court did not abuse its discretion in concluding D.G. would benefit more from adoption than from continuing her relationship with Mother through a long-term guardianship.

Indeed, Mother did not show that terminating her parental rights would deprive D.G. of "'a substantial, positive emotional attachment'" with Mother, or that D.G. would be greatly harmed if Mother's parental rights were terminated. (*In re B.D.*, *supra*, 159 Cal.App.4th at p. 1235.) D.G. was only 17 months old at the time of the section 366.26 hearing. D.G. was happy in her grandparents' home, while Mother continued to use methamphetamine and failed to complete numerous treatment programs. In short, there was no "compelling reason" to apply the parental benefit exception. (§ 366.26, subd. (c)(1)(B).)

Lastly, because the court properly refused to apply the parental benefit exception based on Mother's relationship with D.G., there is no basis to reinstate Father's parental rights. (Cal. Rules of Court, rule 5.725(g) [rights of both parents must be terminated in

10

order to free child for adoption]; cf. *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 110 [reinstating one parent's parental rights upon reversal of judgment terminating other parent's parental rights] with *In re Caitlin B.* (2000) 78 Cal.App.4th 1190, 1194 [nothing in former Cal. Rules of Court, rule 1463(g), the predecessor to Cal. Rules of Court, rule 5.725(g), requires one parent's parental rights to be reinstated if other parent's parental rights are reinstated].)

## IV.  DISPOSITION

The March 15, 2015, orders terminating parental rights and selecting adoption as the permanent plan for D.G. are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.


We concur:

McKINSTER
Acting P. J.

MILLER
J.

11